UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 05-CV-2224 (JFB) (RML)
_____

LARRY JACOBSON AS CHAIRMAN OF THE JOINT INDUSTRY
BOARD OF ELECTRICAL INDUSTRY,

Plaintiff,

VERSUS

METROPOLITAN SWITCHBOARD COMPANY, INC.,

Defendant.

_____

MEMORANDUM AND ORDER
June 18, 2007
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Larry Jacobson as Chairman of the Joint Industry Board of Electrical Industry ("Joint Board") filed the instant action for delinquent employee benefit plan contributions under Section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145, against defendant Metropolitan Switchboard Company, Inc. ("Metropolitan Switchboard"). Plaintiff now moves for summary judgment on its claims for contribution, together with interest, liquidated damages and attorneys' fees. For the reasons that follow plaintiff's motion is granted as to defendant's liability. However, because there are issues of fact regarding damages, a trial will be held to determine damages owed.

I. BACKGROUND

The facts described below are taken from the parties' deposition, declarations, affidavits, exhibits and respective Local Rule 56.1 statements of facts.[1] Upon consideration

_____

[1] As an initial matter, defendant failed to follow Local Rule 56.1. Specifically, though defendant submitted a response to plaintiff's 56.1 statement, defendant did not submit correspondingly numbered paragraphs and denied many statements without citation to the record, including a blanket denial of paragraphs 64-112 of plaintiff's statement of facts. The rule provides in relevant part:

(c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the

of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2001).

The Joint Board is the administrator of various employee benefit plans established and maintained pursuant to collective bargaining agreements between Local Union No. 3 of the International Brotherhood of Electrical Works, AFL-CIO ("Local 3" or "the Union"), and employers in the electrical, elevator, sign, television, burglar alarm and other related industries. (Plaintiff's Statement Pursuant to Local Civil Rule 56.1 (hereinafter "Pl.'s 56.1 Stmt") ¶ 1.)[2] The Joint Board is the administrator and fiduciary within the meaning of Sections 3(16)(A)(I) and 2(21)(A) of ERISA, 29 U.S.C. §§ 1002(16)(A)(I) and 1002(21)(A), of each of the following employee benefit plans: the Employee Security Fund Pension Plan, the Employee Security Fund Health and Welfare Plan (collectively, the "Pension and Welfare Plan"), the Educational and Cultural Trust Fund of the Electrical Industry, the Annuity Plan of the Electrical Industry, the Additional Security Benefit Fund of the Electrical Industry (the "ASBF") and the Health Reimbursement Account Fund of the Electrical Industry (the "HRA") and the Deferred Salary Fund of the Electrical Industry (the "401(k) Plan") (collectively, the "Plans"). (*Id*. ¶ 2.) Each of the above Plans is an employee benefit plan within the meaning of 29 U.S.C. § 1002(3), and is a multi-employer plan within the meaning of 29 U.S.C. § 1002(37). (*Id*. ¶ 3.)

The Joint Board and the trust agreements of the employee benefit plans it administers require contributing employers to submit written forms, referred to as "payroll reports," that include the contributing employer's statement of the number of hours worked by its employees in covered employment each week, along with the required contribution payments to the Joint Board. (*Id*. ¶ 7.) The

---

> moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.
> (d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

Local Rule 56.1(d); *see Chimarev v. TD Waterhouse Investor Servs., Inc*., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence") (citations omitted), *aff'd*, 99 Fed. Appx. 259, 2004 WL 1013320, at *1 (2d Cir. 2004); *see also Blackmon v. UNITE!*, No. 03 Civ. 9214 (GWG), 2005 U.S. Dist. LEXIS 18004, at *4 (S.D.N.Y. Aug. 25, 2005) ("More significantly, [the] Rule 56.1 counter-statement is deficient because none of the assertions set forth therein are followed by citation to evidence which would be admissible, as required by Local Civ. R. 56.1(d)."). However, even though defendant's motion does not comply with Local Rule 56.1, the Court has carefully reviewed defendants' affidavits and exhibits for evidence in support of defendant's position.

---

[2] Where only one party's 56.1 Statement is cited, the other party does not dispute the facts alleged.

2

Joint Board also requires contributing employers to submit periodic audits of their books and records to verify that the correct amount of contributions have been made and to identify all individuals who may be eligible for benefits from the Joint Board. (*Id.* ¶ 8.) Pursuant to the collective bargaining agreements and the trust agreements for the employee benefit plans, the Joint Board is the administrator and fiduciary of the employee benefit plans. (*Id.* ¶ 10.) The collective bargaining agreements and the trust agreements require employers to remit contributions directly to the Joint Board and the Joint Board is empowered to enforce the contribution obligation. (*Id.* ¶ 10.) Contributions for employee benefit plans are calculated as a percentage of employee gross wages, inclusive of regular or straight time and overtime hours, plus vacation time, jury duty, sick pay, bereavement pay and commissions. (*Id.* ¶ 10(a)). The Joint Board calculates interest in accordance with either the collective bargaining agreement and trust agreements of the plans, or Section 6621 of the Internal Revenue Code of 1986, as amended, as permitted by 29 U.S.C. § 1132(g)(2). (*Id.* ¶ 11.)

Metropolitan Electric Manufacturing Co., Inc. ("MEMCO") was a New York corporation located at 200 Dixon Avenue in Amityville, New York. (*Id.* ¶ 12.) It was engaged in the electrical manufacturing business, including the manufacture of panel boards, switchboards, CT cabinets, bus way, streetlighting cabinets and transit panels. (*Id.* ¶ 12.) MEMCO was owned equally by the families of two brothers, Joseph and James Shelley. (*Id.* ¶ 13.) Members of the James Shelley side of the family who were owners of MEMCO included Sheryn Silvestri, who is James Shelley's daughter and Louis Silvestri's wife; Mike Shelley, who is Sheryn Silvestri's brother; James Shelley, Jr., who is another brother of Sheryn Silvestri; and the elder James Shelley. (*Id.* ¶ 14.) James Shelley was the president of MEMCO until his death in 1995, at which time Louis Silvestri ("Silvestri") became acting president of MEMCO. (*Id.* ¶ 15.) Prior to taking over as acting president of MEMCO, Silvestri was the company's controller. (*Id.* ¶ 16.)

MEMCO signed a series of collective bargaining agreements with Local 3, including for the periods of October 1, 1997 to September 20, 2000 (the "1997-2000 CBA") and October 1, 2000 to September 30, 2003 (the "2000-2003 CBA") (collectively, the "MEMCO CBAs"). (*Id.* ¶ 18.) Pursuant to the MEMCO CBAs, MEMCO was required to remit contributions to the Joint Board for the Plans. (*Id.* ¶19.)

On November 2, 2001, MEMCO filed for Chapter 11 bankruptcy protection. (*Id.* ¶ 20.) In its schedule of debts dated November 14, 2001, MEMCO listed a debt to the Joint Board in the amount of $5,331.44 and that amount was verified by Silvestri. (*Id.* ¶ 21-22.) On November 25, 2002, the Joint Board conducted an audit of MEMCO's books and records covering the period of January 1, 1998 through December 31, 2001, at MEMCO's offices. (*Id.* ¶ 23-24.) When the Joint Board's auditor, Ronald Flitt, arrived at MEMCO's office, he met with Silvestri. (*Id.* ¶ 25.) Silvestri provided Flitt with the W-2 forms for MEMCO's employees, copies of MEMCO's federal and state tax returns, disbursement journals, and the check register and general ledger. (*Id.*)

The Joint Board argues, however, that the check register that was provided to Flitt was flawed in that there were large gaps in the listed check numbers and that "outside"

3

purchases were listed that did not identify payees. (Flitt Decl. ¶ 14 and Ex. D.) Charles Shields, a forensic accountant, who had been retained by a co-owner of MEMCO to conduct a forensic audit of MEMCO in connection with a dispute between MEMCO's various owners, also found that the check register was not properly maintained.[3] (Flitt Decl. ¶ 15-16a.)

In Flitt's review of MEMCO's records, Flitt also discovered that MEMCO had not reported any overtime work for covered employees. (Flitt Decl. ¶ 20.) Flitt concluded that the checks that were listed as "outside" services and purchases, and that did not have payees, were for income for covered employees that was not reported to the Joint Board. (Flitt Decl. ¶ 21.) According to Flitt's audit report, MEMCO owed $109,907.53 in contributions to the Joint Board, $92,577.40 of which represented contributions based on unreported income. (Flitt Decl. ¶¶ 22-23.)

The audit report was sent to MEMCO on January 14, 2003. (Pl.'s 56.1 Stmt. ¶ 34.) Flitt asked MEMCO to contact him to arrange for payment of the audit deficiency or to provide an explanation for the deficiency within thirty-days. (Flitt Decl. ¶ 24 and Ex. 4.) According to the Joint Board, MEMCO only contested the audit with respect to its inclusion of "cap" deductions, which limited the amount of certain contributions an employer was required to pay once a previously agreed upon cap had been reached. (Flitt Decl. ¶ 25.) However, Silvestri contests the findings of Flitt's audit report – specifically, he calls into question Flitt's reliance on Shields' audit, attributes any problems with the records to the fiscal agent or bankruptcy trustee, asserts that there was no overtime in the industry, that the unidentified checks were not for wages, that he provided Flitt with all of the documents that were requested and that were in possession of Metropolitan Switchboard, and that he has always disputed Flitt's findings. (Silvestri Aff. 8-11.)

In mid- to late-2003, the Joint Board agreed not to seek payment of the cap deduction MEMCO had taken and the audit report findings were subsequently adjusted to remove the cap deduction from the audit deficiency. (Pl's 56.1 Stmt. ¶ 36.) In August 2003, the Joint Board filed a proof of claim in MEMCO's bankruptcy proceeding. (Id. ¶ 37.) In January 2004, the Joint Board produced a revised audit report based on copies of checks that filled in a portion of the gaps in MEMCO's check register, which found that $101,953.38 was owed to the Joint Board. (Id. ¶ 38.) In addition, the Joint Board calculated interest due in the amount of $80,545.52. (Id. ¶ 38.) In April 2004, the Joint Board and MEMCO's bankruptcy estate reached a settlement agreement, pursuant to which the estate agreed to pay the Joint Board $68,908.12 towards the audit deficiency and the agreed upon payments were made by the estate. (Id. ¶ 39.)

Metropolitan Switchboard was incorporated in New York on October 1, 2001, but did not start doing business until

---

[3] Defendant asserts that Shields' report is hearsay and contests its admissibility. (Def.'s 56.1 ¶ 4.) Specifically, defendant asserts that Shields' report was rejected by the fiscal agent appointed by the New Jersey courts in connection with the disputes between MEMCO's co-owners and was rejected by the accountant in the bankruptcy proceeding. (Silvestri Aff. at 8.) Defendant also asserts that Shields' audit was conducted under a Stipulation of Confidentiality between Shields and Joseph Shelley. (Silvestri Aff. at 8.)

4

July 1, 2002. (*Id.* ¶ 41.) Metropolitan Switchboard is in the electrical switchboard and panel manufacturing business and is considered an "employer" within the meaning of 29 U.S.C. § 1002(5). (*Id.* ¶¶ 6, 47.) Its principal place of business, since it began operations in July 2002, is located at 200 Dixon Avenue, Amityville, New York. (*Id.* ¶¶ 5, 44.) At the time of incorporation, Metropolitan Switchboard was owned by Louis Silvestri, his wife, Sheryn Silvestri, and her two brothers, Mike Shelley and James Shelley Jr. (*Id.* ¶ 42.) As of June 26, 2006, the owners of Metropolitan Switchboard were Louis and Sheryn Silvestri and James Shelley, Jr. (*Id.*) Louis Silvestri has also been the president of Metropolitan Switchboard since its inception. (*Id.* ¶ 45.) Sheryn Silvestri, James Shelley, Jr., and Mike Shelley were also three of the many owners of MEMCO. (Asad Decl. Ex. B. at 11-12.)

On June 20, 2002, the bankruptcy court presiding over MEMCO's bankruptcy estate authorized the sale of assets from MEMCO to Metropolitan Switchboard. (Pl.'s 56.1 Stmt. ¶ 43.) This sale included accounts receivable, inventory, machinery and equipment and MEMCO's name and trademark. (*Id.*) There was no break in operations between MEMCO's cessation of operation and Metropolitan Switchboard's commencement of operations. (*Id.* ¶ 49.) MEMCO's workforce at the time of the asset sale in the bankruptcy proceeding remained as employees of Metropolitan Switchboard for at least some period of time. (Asad Decl. Ex. B. at 54.) Specifically, Silvestri testified that "right at the time of the purchase, [the MEMCO employees] were kept [] – on for a short period, for a time for them to find other jobs." (*Id.* at 50.) Employees who remained with Metropolitan Switchboard did the same type of work they did for MEMCO – assembling power boards and switchboards.[4] (*Id.* at 56.) Thirteen of Metropolitan Switchboard's customers were customers of MEMCO. (Asad Decl. Ex. G.)

Metropolitan Switchboard uses two vehicles for making deliveries, both of which were previously used by MEMCO. (Pl.'s 56.1 Stmt. ¶ 54.) Metropolitan Switchboard also uses some of the same equipment that MEMCO used, including drills and hydraulic sheers used to cut steel. (*Id.* ¶ 55.) In addition, W-2 forms issued to employees of Metropolitan Switchboard from 2002 through 2004 listed the employer as MEMCO, rather than Metropolitan Switchboard. (*Id.* ¶ 56.) Further, federal quarterly tax returns filed for 2002, 2003, and 2004 all bear MEMCO's name, not Metropolitan Switchboard's name, even though the annual tax filings bear Metropolitan Swithboard's name; and Metropolitan Switchboard's general ledger, other internal financial documents and payroll reports all identified the company as MEMCO. (*Id.* ¶¶ 57.) Checks issued by Metropolitan Switchboard also bear MEMCO's name rather than Metropolitan Switchboard's. (*Id.* ¶ 58.)

Metropolitan Switchboard continued to remit union dues for its employees who were Local 3 members through 2003. (*Id.* ¶ 59.) Metropolitan Switchboard also remitted union

---

[4] Metropolitan Switchboard repeatedly points to the fact that its work is focused on the assembly of power boards and switchboards, while MEMCO had a broader focus. However, the Court does not see how this distinction provides support for defendant's position that the companies are two distinct entities and that the employees engage in "different" work simply because Metropolitan Switchboard's focus is a subset of that of MEMCO's.

5

dues on its general ledger for its employees who were Local 3 members throughout the period in 2004 between the time when Metropolitan Switchboard stopped remitting contributions to the Joint Board and when it signed the 2003-2006 CBA – between February 2004 and August 2004.[5] (Asad Decl. Ex. M.)

As recently as September 2006, Metropolitan Switchboard's payroll records as produced by its payroll service provider, identified it as MEMCO, not Metropolitan Switchboard. (Pl.'s 56.1 Stmt. ¶ 63.)

## II. DISCUSSION

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R.*

---

[5] Metropolitan Switchboard asserts in its response to plaintiff's 56.1 statement that it remitted contributions for union dues at the request of the workers and that this money was contributed directly from employees and not on behalf of Metropolitan Switchboard. (Def.'s 56.1 ¶ 9.) However, defendant does not identify any evidence in support of its position. On the other hand, the Joint Board points to Metropolitan Switchboard's 2004 General Ledger, which shows that contributions were made by Metropolitan Switchboard.

6

*Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

### A. The 1998-2001 Audits

The undisputed facts show that defendant has the same principal place of business that MEMCO had, there was no cessation in operations between defendant's commencement of operations and MEMCO's cessation of operations, most of defendant's workers had been employed by MEMCO (though defendant has a smaller workforce), defendant's business is a subset of MEMCO's business (the sale and manufacture of switchboards and panel boards for electrical contractors), thirteen of defendant's customers were customers of MEMCO,[6] the former acting President of MEMCO became the President of defendant, and two of the three current owners of plaintiff were owners of MEMCO.

Based on the undisputed facts, the Joint Board argues that Metropolitan Switchboard is liable for the amounts due under the 1998-2001 audits under the MEMCO CBAs, as MEMCO's alter-ego. This is because, "[i]f two companies are deemed alter egos of each other, then each is bound by the collective bargaining agreements signed by the other." *Lihli Fashions Corp., Inc. v. NLRB*, 80 F.3d 743, 748 (2d Cir. 1996); *see also Truck Drivers Local Union No. 807, I.B.T. v. Regional Import & Export Trucking Co., Inc.*, 944 F.2d 1037, 1046 (2d Cir. 1991) ("The alter ego doctrine provides an analytical hook to bind a non-signatory to a collective bargaining agreement."). As set forth below, the Court concludes that undisputed facts demonstrate that Metropolitan Switchboard is the alter-ego of MEMCO.

In making the determination as to whether two or more companies are alter-egos, the Second Circuit has instructed courts to focus on the "commonality of (i) management, (ii) business purpose, (iii) operations, (iv) equipment, (v) customers, and (vi) supervision and ownership, as well as on whether the succession of employers was motivated by anti-union sentiment." *Newspaper Guild of N. Y., Local No. 3 of Newspaper Guild, AFL-CIO v. N.L.R.B.*, 261 F.3d 291, 294 (2d Cir. 2001) (citing *Goodman Piping Prod., Inc. v. N.L.R.B.*, 741 F.2d 10, 11-12 (2d Cir. 1984)). "No one factor is controlling, and all need not be present to support a finding of alter ego status." *C.E.K. Indus. Mech. Contrs, Inc. v. N.L.R.B.*, 921 F.2d 350, 354 (1st Cir. 1990). When addressing disputes arising under ERISA, "[t]he focus of the alter ego doctrine . . . is on 'the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations.'" *Lihli*, 80 F.3d at 748 (quoting *Truck Drivers*, 944 F.2d at 1046) (internal quotation omitted); *accord Mason Tenders Dist. Council Welfare Fund v. Kan Klean Indus., Inc.*, No. 92-CV-7688 (AGS), 1996 WL 447751, at *6 (S.D.N.Y. Aug. 7, 1996); *see also Goodman Piping Prod*., 741 F.2d at 12 ("[A]nti-union animus may be 'germane' . . . or even a sufficient basis for imposing alter ego status," but such anti-union motivation is not necessary to impose alter ego status.) (internal citations omitted).

An examination of the factors listed above demonstrates that Metropolitan Switchboard is the alter-ego of MEMCO as a matter of law.

---

[6] In his deposition, Silvestri recalled five customers of Metropolitan Switchboard who were not formerly customers of MEMCO. (Asad Decl. Ex. B. a 42.)

The two companies share similar management and ownership. That is, two of the current owners of Metropolitan Switchboard were two of the owners of MEMCO and the third owner, Louis Silvestri, is the husband of one of the two owners who was an owner of MEMCO. *See Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 309 (1st Cir. 1998) ("Continuity of ownership has been found to exist when the nonsignatory and signatory companies are owned by members of the same family."); *but see In re Armen Digital Graphics, Ltd.*, No. 96-CV-5844 (LBS), 1997 WL 458738, at *7 n.9 (S.D.N.Y. Aug. 8, 1997) ("Were courts to assume alter ego status merely from the closely held ownership of the two companies by members of the immediate family, families would be effectively precluded from organizing their business affairs in any but a single corporate entity."). In addition, Louis Silvestri, who functioned as MEMCO's president, is now president of Metropolitan Switchboard.[7] Furthermore, Silvestri supervised the day-to-day operations of MEMCO and now does the same for Metropolitan Switchboard. In addition, the shop steward for MEMCO since 1996, Richard Wine, is now the shop steward for Metropolitan Switchboard. (Wine Aff. at 1.) There is also overlap in some other members of the work force. That Metropolitan Swithboard's labor force is much smaller than MEMCO's (Silvestri Aff. at 4), does not undermine this factor, as most of Metropolitan Switchboard's workers had been employed by MEMCO. (*Id.*)

---

[7] On September 20, 2001, Silvestri resigned from MEMCO, and MEMCO ceased to operate. (Silvestri Aff. at 3, Ex. D.) He later resumed his position at MEMCO on October 8, 2001 at the request of the fiscal agent. (Silvestri Aff.. at 3, Ex. E.)

As to the second factor, MEMCO and Metropolitan Switchboard share substantially the same business purpose. Though MEMCO performed additional tasks, both companies are engaged in the manufacture of panel boards and switchboards for electronic equipment. There is also undisputed evidence that the companies shared common equipment for manufacturing and that the two vehicles used by Metropolitan Switchboard for making deliveries were both previously used by MEMCO. In fact, the bankruptcy court conducted an auction whereby MEMCO's assets were sold to Metropolitan Switchboard, including accounts receivable, inventory, machinery and equipment and its name and trademark.

In addition, the record demonstrates that MEMCO and Metropolitan Switchboard share substantially the same customers. (*See* Asad Decl. Ex. G.) That Metropolitan Switchboard does not serve *all* of MEMCO's former customers is insufficient to create a triable issue of fact. *See Plumbers, Pipefitters and Apprentices Local Union No. 112 Pension, Health and Educ. and Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating and Fire Suppression Inc.*, 84 F. Supp. 2d 344, 351 (N.D.N.Y. 2000) (holding that company was alter-ego where there was only a 20% overlap in customers given the other "quantum of evidence of overlap between the two companies").

Furthermore, the operations of the two companies substantially overlap. Both companies operated at the same location – 200 Dixon Avenue, Amityville, New York. Metropolitan Switchboard was incorporated just one month before MEMCO filed for Chapter 11 bankruptcy and did not start operating until July 1, 2002, one month after the bankruptcy court authorized the sale of

8

assets from MEMCO to Metropolitan Switchboard.

That MEMCO ceased operations as a result of filing for Chapter 11 bankruptcy does not change this Court's conclusion that the companies are alter-egos. That is, even if Metropolitan Switchboard was not created in an effort to avoid obligations under the collective bargaining agreement, the undisputed evidence is such that no reasonable jury could find that the companies are not alter-egos. *A & P Brush Mfg. Corp. v. N.L.R.B.*, 140 F.3d 216, 220 (2d Cir. 1998) ("Although anti-union animus may be germane, it is not necessary for a finding of alter ego status.") (internal quotations omitted); *Plumbers, Pipefitters and Apprentices Local Union No. 112 Pension Health and Educational and Apprenticeship Plans*, 84 F. Supp. 2d 344, 351 (N.D.N.Y. 2000) ("The fact that [the company] ceased doing business due to financial difficulty . . . does not prevent [the] Court from finding that [the new company] is its alter ego."); *see also Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantuch, Inc.*, 316 F. Supp. 2d 130, 144 n.10 (N.D.N.Y. 2003) (concluding that companies were alter-egos and noting that even if the new company was "formed under innocent pretenses, the method of its creation, and its close interaction and relationship with a company that disregarded its ERISA obligations, suffices to hold it responsible").

In short, the only real dispute with respect to the facts relevant to the alter-ego analysis is whether defendant was created in an effort to avoid obligations under the CBA. Thus, applying the above factors, the Court concludes that there is no genuine issue of material fact that Metropolitan Switchboard is MEMCO's alter-ego for purposes of imposing liability under ERISA.[8] *See, e.g.*, *Mass. Carpenters Cent. Collection Agency*, 139 F.3d at 309 (affirming district court's grant of summary judgment to plaintiff on theory of alter-ego liability); *Plumbers, Pipefitters and Apprentices*, 84 F. Supp. 2d at 351 (granting summary judgment for plaintiff on alter-ego theory). Accordingly, Metroplitan Switchboard is bound by the 1998-2001 MEMCO CBAs.[9]

B. The 2000-2003 CBA

Having found that Metropolitan

---

[8] Though plaintiff provides additional arguments under a theory of successor liability, having found that there is no genuine issue of material fact as to whether Metropolitan Switchboard is the alter ego of MEMCO, a separate analysis applying the principals of successor liability is not required. *See Mass. Carpenters Cent. Collection Agency*, 139 F.3d at 307 ("[A]lter ego doctrine is primarily applied in situations involving successor companies . . . [but] it also applies to situations where the companies are parallel companies.").

[9] The Joint Board's waiver of claims in conjunction with the settlement with the bankruptcy trustee in the amount of $68,908.12, in April 2004 does not prevent collection of the funds due under the 1997-2000 MEMCO CBA. The stipulation provided a waiver of all claims "against the Debtor and the Trustee only and [the Joint Board] expressly preserves any and all Waived Claims arising out of or related to the Unpaid Union Benefits as against any third parties." (Duffy Decl., Exh. A ¶ 4.) The language of the stipulation explicitly provides that the Joint Board can proceed against third parties and defendant cannot now hide from its obligations by arguing that MEMCO settled a portion of the claims. *See Lumpkin v. Envirodyn Indus.*, 933 F.2d 449, 460 (7th Cir. 1991) ("The alter ego doctrine is a sword, not a shield, the basis for a cause of action, not a defense.").

9

Switchboard is MEMCO's alter-ego and was bound by the 1998-2001 MEMCO CBAs, Metropolitan Switchboard is also bound by successor agreements if it manifested an intent to be bound. *Brown v. C. Volante Corp*., 194 F.3d 351, 354-56 (2d Cir. 1999) (holding that a party to a prior written agreement is bound to unsigned successor agreement when it manifests an intention to remain bound thereto). Here, based upon the undisputed evidence, Metropolitan Switchboard adopted the 2000-2003 MEMCO CBA by demonstrating an intent to be bound by way of performance under the agreement when it began operations in June 2002. ERISA "Section 302(c)(5)(B) does not require that an agreement be signed, only that it be 'written' and set forth 'a detailed basis on which . . . payments are to be made' to a trust fund." *Brown*, 194 F.3d at 355 (quoting Section 302, 29 U.S.C. § 302(c)(5)(B)). Thus, "'both § 302(c)(5)(B) and general principles of contract law permit an employer to adopt a collective bargaining agreement by a course of conduct plus a writing . . . [;] a signature at the bottom of the collective bargaining agreement itself is unnecessary.'" *Id*. (quoting *Moriarty v. Larry G. Lewis Funeral Dirs. Ltd.*, 150 F.3d 773, 777 (7th Cir. 1998)). In *Volante*, the Second Circuit held that contributions at the rate that was prescribed by the unsigned CBAs "manifested an intent [by the employer] to adopt, or agree to, the unsigned CBAs" and granted summary judgment in favor of the plans. *Id*. at 355 & 355 n.1 (distinguishing *Moglia v. Geoghegan*, 403 F.2d 110, 118 (2d Cir. 1968), where the court held that a written agreement between the union and the trust did not comply with ERISA where neither party had ever signed the CBA and the employer "did not appear to be willing to accept [the] terms [of the unsigned CBA] at any time"); *see also King v. Silver Streak Transp., Ltd.*, No. 05-CV-1085 (SMG), 2007 U.S. Dist. LEXIS 7690, at *5-*7 (E.D.N.Y. Feb. 2, 2007) (employer demonstrated an intent to be bound where, among other things, it continued to use union employees and submitted signed remittance reports); *Trs. of the Plumbers & Steamfitters Local 267 Pension, Annuity, and Ins. Funds v. Buchanan, Inc*., No. 03-CV-898 (FJS) (GJD), 2006 U.S. Dist. LEXIS 7166, at *13 (N.D.N.Y. Feb. 16, 2006) (finding that employer demonstrated an intent to be bound where it implemented new rates by paying the increased wages and employer employed union employees and deducted union dues); *Composition Roofers Union Local No. 30 Welfare Trust Fund v. L.A. Kennedy, Inc.*, No. 93-CV-1558 (HJH), 1996 WL 220975, at *4 (E.D. Pa. May 2, 1996) (failure of employer and trustee to sign CBA "amounts to nothing more than a defect in the formation of the CBA" and "the law is clear that [employer] is not released from its obligations to pay contributions to the Funds").

Here, though Metropolitan Switchboard was not a signatory to the 2000-2003 CBA, it is undisputed that Metropolitan Switchboard remitted contributions and paid wages at the rates established by the 2000-2003 CBA for all of 2002 and 2003, once it began operations. Thus, consistent with the Second Circuit's holding in *Volante*, the Court finds that Metropolitan Switchboard manifested a clear intent to be bound by the 2000-2003 CBA as a matter of law. *See e.g*., *Brown*, 194 F.3d at 356 (affirming summary judgment where no genuine issue of material fact as to whether defendant's conduct manifested an intent to be bound by the unsigned CBAs); *Trs. of the Plumbers & Steamfitters Local 267 Pension, Annuity, and Ins. Funds*, 2006 U.S. Dist. LEXIS 7166, at *13 (granting summary judgment for plaintiff where no issue of fact as to whether defendant manifested an intent

10

to be bound). Accordingly, Metropolitan Switchboard is responsible for the underpaid contributions under the 2000-2003 CBA.

### C. The 2003-2006 CBA

After Metropolitan Switchboard purchased the assets of MEMCO, a meeting was held between Lance Van Arsdale, the Local 3 representative, Louis Silvestri, and Richard Wine. (Wine Aff. at 1.) At that meeting, Lance Van Arsdale indicated that he would obtain a union contract for Metropolitan Switchboard. (*Id*.) However, the contract that was sent was not made out to Metropolitan Switchboard, but was made out to MEMCO. (*Id*. at 2.) Because it was improperly made out to MEMCO, Silvestri did not sign that contract. (*Id*.) Lance Van Arsdale sent a new contract that was received by Metropolitan Switchboard in late 2004. (*Id*.) At that time, Silvestri, on behalf of Metropolitan Switchboard, signed the contract and sent it back to Local 3. (Wine Aff. at 2.) A letter dated August 14, 2004 from Leland Beck, attorney for Silvestri, to Lance Van Arsdale states, "[t]his letter will confirm that as of this date, Metropolitan Switchboard . . . and Local 3 have entered into the industry-wide [CBA] dated October 1, 2003." (Duffy Decl., Ex. B.) According to Wine's affidavit, in early 2005, Wine placed several calls to Local 3 requesting that they forward Metropolitan Switchboard a signed contract and Union labels. Metropolitan Switchboard argues that there is no contract because (1) the signed contract was never returned to Metropolitan Switchboard; (2) the contract bears only the signatures of Metropolitan's president and Local 3's business representative and lacks the signature of Local 3's business manager; and (3) Metropolitan Switchboard never received the Union labels to place on the products they manufacture.

(Wine Aff. at 2.) Silvestri testified that, while he had thought Metropolitan Switchboard was becoming part of Local 3 when the August 16, 2004 letter was written, he thought Metropolitan Switchboard was no longer "considered to be a union shop" when it did not receive the union labels and did not receive the signed contract. (Silvestri Dep. at 65.)

As explained *supra*, that plaintiff never signed the contract is not dispositive where the employer demonstrates an intent to be bound. Furthermore, the 2003-2006 CBA bore Metropolitan Switchboard's signature, which alone is sufficient to demonstrate Metropolitan Switchboard's intent to be bound by the 2003-2006 CBA. *See Benson v. Brower's Moving & Storage, Inc*., 907 F.2d 310, 313 (2d Cir. 1990) (holding that the existence of a CBA that was signed by the employer "prove[d] that the employer promised to contribute to the plan."). Accordingly, defendant's first and second points, which are focus on Local 3's signature, are without merit. Defendant's third point, that it is not bound because Union labels were never received, is equally unavailing. In *Benson*, the Second Circuit examined whether an employer could avoid making contributions based on a showing that the Union abandoned the CBA. 907 F.2d 310 (2d Cir. 1990). The Court determined that Section 515[10] allows an employer who is sued

---

[10] Section 515 provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the

11

by an employee benefit plan to assert only two defenses: "(1) that the pension contributions themselves are illegal, and (2) that the collective bargaining agreement is void (not merely voidable)." *Id*. at 314 (internal citations omitted). Thus, the Court held that "once an employer knowingly signs an agreement that requires him to contribute to an employee benefit plan, he may not escape his obligation by raising defenses that call into question the union's ability to enforce the contract as a whole." *Id*. The Court then rejected the defendant's abandonment defense. *Id*.

Here, Metropolitan Switchboard is not arguing that the pension contributions themselves are illegal; rather, Metropolitan Switchboard argues that the CBA is void because no union labels were provided. Even assuming *arguendo* that the CBA required plaintiff to provide union labels, the failure to provide the labels would not render the contract void. *See O'Hare v. Gen. Marine Transp. Corp.*, 740 F.2d 160, 170 (2d Cir. 1984) (holding that a union's breach of a CBA does not relieve employer of obligation to contribute) (citing *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 468-71 (1960) ); *see also Bricklayers & Allied Craftworkers Local 2, Albany*, 316 F. Supp. 2d at 146 ("[E]xcluded from the permissible defenses to a Section 515 collection action are those going to contract formation – such as a lack of a meeting of the minds, unilateral or mutual mistake, or duress, all of which if proven render an agreement voidable, but not void – as well as defenses sounding in breach of contract.") (footnote omitted). "[B]enefit plans must be able to rely

terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations." *Benson*, 907 F.2d at 314. Accordingly, Metropolitan Switchboard is responsible for contributions under the 2003-2006 CBA.[11]

---

[11] Metropolitan Switchboard did not sign the 2003-2006 CBA until August 14, 2004. However, Metropolitan Switchboard is still responsible for contributions starting in October 1, 2003, because Metropolitan Switchboard manifested an intent to adopt the 2003-2006 CBA. The only reason Silvestri gave for not signing the 2003-2006 CBA before August 14, 2004, was because the contract that was sent incorrectly bore the name MEMCO. (*See* Silvestri AfF. Ex. G.) Silvestri requested a new copy of the contract and paid benefits for a period of time. (Silvestri Aff. at 11.) Metropolitan Switchboard continued to remit union dues for its employees who were Local 3 members through December 2003. (Pl.'s 56.1 Stmt. ¶ 59.) In December 2003, Silvestri wrote to Lance Van Arsdale describing his intent to be bound:

> As you know I have been waiting since October 1st to sign the union agreement. The one you sent had the wrong name. . . . Enclosed are the union checks which I've held until that was accomplished. I'm sending them now however because it's now eleven weeks and I've heard nothing from you and do not want to have a problem. I am instructing you to credit the account of Metropolitan Switch Board [sic] Company Inc.dba [sic] Metropolitan Electric Mfg. Co. and will be continuing to send you the checks for the following weeks until we are caught up.

(Silvestri Aff. Ex. G.) Prior to obtaining the contract containing the correct name, Metropolitan Switchboard again manifested an understanding and intent that it was bound by the contract by submitting payroll reports to plaintiff for the period of ending January 7, 2004 through

### D. Damages

Plaintiff asserts, based on the Flitt audit, that the principal balance of the audit deficiency is $33,045.26 with interest in the amount of $80,545.52, and that defendant owes $198,118.89 for delinquent contributions from 2002 through September 2006, with interest on the delinquent contributions in the amount of $33,250.34. (Flitt Decl. ¶¶ 31, 60, 61.) However, Silvestri contests the findings of Flitt's audit report. As described *supra*, Silvestri calls into question Flitt's reliance on Shields' audit, attributes any problems with the records to the fiscal agent or bankruptcy trustee, asserts that there was no overtime in the industry, and that the unidentified checks were not for wages. (Silvestri Aff. 8-11.) The Silvestri affidavit and evidence contained therein is sufficient to create material issues of disputed fact that preclude summary judgment in plaintiff's favor on the issue of damages.

### III. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment on the issue of liability is GRANTED and defendant is liable for amounts owed under the 1998-2001, 2000-2003, and 2003-2006 CBAs. However, because there are disputed issues of fact as to the accuracy of the audit and the amounts due under the CBAs, plaintiff's motion for summary judgment on the issue of damages is DENIED and a trial will be held solely to address the issue of damages.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 18, 2007
Central Islip, New York

\* \* \*

The attorney for plaintiff is Eyad Asad, Esq., Cohen, Weiss and Simon LLP, 330 West 42nd Street, New York, New York, 10036. The attorney for defendant is Leland S. Beck, Esq., Beck, Gewurz & Strauss, 50 Charles Lindbergh Boulevard, Uniondale, New York 11553.

---

February 11, 2004, and by remitting contributions for that period at the rates that were prescribed in the 2003-2006 CBA. (Flitt Decl. ¶ 50 and Ex. T.) In addition, though Metropolitan Switchboard ceased remitting contributions after February 11, 2004 until it signed the 2003-2006 CBA, it continued to account for the contributions in its general ledger by applying the amounts allocable to each of the employee benefit plans for which contributions were due under the 2003-2006 CBA, as a debit through April 2004. (Asad Decl. Ex. M.) Thus, Metropolitan Switchboard is bound to the 2003-2006 CBA in its entirety.